**BOSSIER CITY MEDICAL SUITE, INC. et al.**

v.

**CITY OF BOSSIER CITY et al.**

Civ. A. No. 79–1336.

United States District Court,
W. D. Louisiana,
Shreveport Division.

Jan. 21, 1980.

Ronald J. Miciotto, Bossier City, La., Roy Lucas, Lynn I. Miller, Lucas & Miller, Washington, D. C., for plaintiffs.

Michael G. Latimer, Asst. City Atty., Bossier City, La., for defendants Bossier City, et al.

Louis M. Kiefer, Jr., Metairie, La., for defendant Employers Insurance of Wausau.

## OPINION

STAGG, District Judge.

On January 22, 1973, the Supreme Court rendered its landmark decisions on abortion. *Roe v. Wade*, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973) and *Doe v. Bolton*, 410 U.S. 179, 93 S.Ct. 739, 35 L.Ed.2d 201 (1973). In *Roe v. Wade*, the Supreme Court held that under the due process clause a woman's right to choose an abortion is a protected liberty, indeed a fundamental right, so important that a governmental body cannot prohibit it entirely or burden it significantly during the first trimester of pregnancy. Although *Wade* and *Bolton* established that the constitutionally protected right of privacy encompasses a woman's decision to terminate her

pregnancy, the court also held that this right is not absolute. As the pregnancy progresses, the woman's right to terminate diminishes and the state's right to regulate or even override the woman's right increases. The Court held:

> With respect to the State's important and legitimate interest in the health of the mother, the "compelling" point, in the light of present medical knowledge, is at approximately the end of the first trimester. . . . It follows that, from and after this point, a State may regulate the abortion procedure to the extent that the regulation reasonably relates to the preservation and protection of maternal health. . . .
>
> This means, on the other hand, that, for the period of pregnancy prior to this "compelling" point, the attending physician, in consultation with his patient, is free to determine, without regulation by the State that, in his medical judgment, the patient's pregnancy should be terminated. If that decision is reached, the judgment may be effectuated by an abortion *free of interference by the State.*

410 U.S. at 163, 93 S.Ct. at 731–732 (emphasis added). Specifically, during the first trimester, the abortion decision must be left to the woman and the medical judgment of her attending physician. During the second trimester the State may impose regulations which are rationally related to the legitimate State interest in the woman's health. After fetus viability in the third trimester, the State's interest in fetal life allows it to prohibit the abortion altogether except where maternal life is endangered. *Wade, supra,* at 164, 93 S.Ct. 705; *Planned Parenthood Association of Missouri v. Danforth,* 428 U.S. 52, 96 S.Ct. 2831, 49 L.Ed.2d 788 (1976); *Wynn v. Scott,* 449 F.Supp. 1302 (N.D.Ill.1978) (three-judge court); *Arnold v. Sendak,* 416 F.Supp. 22 (S.D.Ind.) (three-judge court), *affirmed,* 429 U.S. 968, 97 S.Ct. 476, 50 L.Ed.2d 579 (1976).

Since the Supreme Court's decision in *Roe v. Wade,* heated emotional battles have been enacted in communities across the country. Low cost, outpatient abortion clinics offering first trimester abortions are meeting with stubborn and calculated resistance from the local citizenry and their governing authorities. *See, e. g., Fox Valley Reproductive Health Care Center, Inc. v. Arft,* 446 F.Supp. 1072 (E.D.Wis.1978); *Mahoning Women's Center v. Hunter,* 444 F.Supp. 12 (N.D.Ohio 1977); *Planned Parenthood of Minnesota, Inc. v. Citizens for Community Action,* 558 F.2d 861 (8th Cir. 1977). The present suit was brought by the plaintiffs to enjoin zoning discrimination by Bossier City that it is alleged unduly burdens the right of privacy and is so arbitrary and capricious as to violate the due process and equal protection clauses of the Fourteenth Amendment. The suit was filed pursuant to 42 U.S.C. §§ 1983, 1985 and 1988. Plaintiffs also seek a declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202. This court's jurisdiction is conferred by 28 U.S.C. §§ 1331 and 1343.

■ The issue in the present case differs from the problems presented in the typical abortion cases which involved municipal zoning decisions. In this case, there is a preexisting valid zoning ordinance.[1] The ordinance was not passed in response to the clinic's location in the community. Neither does the city's ordinance attempt to regulate abortion clinic procedures. The question presented in this case is whether the application of a valid preexisting zoning ordinance has impermissibly restricted the woman's right to a first trimester abortion guaranteed by *Roe v. Wade.* This court holds that it does not.

### I.

In early Spring of 1979, Martin, Martin & Richards, Inc. (hereinafter referred to as "M. M. & R."), a Texas corporation acting on behalf of its wholly-owned subsidiary, Bossier City Medical Suite, Inc. (hereinafter referred to as "B. C. M. S."), sent its employee, Ms. Barbara Oakes, to search the Shreveport-Bossier City area for property suitable for an outpatient abortion clinic.

---

1. Bossier City, La., Ordinances No. 33 (Supp. 1958).

On March 6, 1979, the building located at 1505 Doctor's Drive, Bossier City, Louisiana, was acquired by M. M. & R. This site was selected after viewing only two other alternative locations and apparently without a legal inquiry into possible zoning complications.[2]

Plaintiff B. C. M. S., a Louisiana corporation, leased the building from its parent corporation, M. M. & R.[3] The property was located in a B–1 Transitional Business District Zone which permitted uses including a medical or dental clinic.[4] Plaintiff then remodeled the facility and equipped it to handle first trimester abortions on an outpatient basis. Plaintiff has also engaged certain area physicians to perform the abortions using the vacuum currettage technique. Currently, the facility is equipped to handle an estimated 50 patients per week on a six-day work week basis.

█ The facility was ready to open in September of 1979. However, after talking to Mamie Hatfield, the Bossier City Zoning Administrator, plaintiff's local attorneys, Ronald J. Miciotto and Michael Beam, became aware of possible problems with the City's zoning ordinance.[5] On September 12, 1979, as required by Bossier City law,[6] an application for a certificate of occupancy was filed on behalf of B. C. M. S. (See Exhibit P–2 attached to plaintiff's original complaint.) The application stated that the use of the building was for "medical purposes—clinic or medical as defined in B–1". Plaintiff's attorneys also indicated on the

---

**2.** The trial testimony of Ms. Mamie Hatfield, Bossier Zoning Administrator, established that properly zoned property was available at the time M. M. & R. purchased the property. It is still available.

**3.** At the trial of this matter, plaintiff did not introduce copies of this lease, or of the respective articles of incorporation. In their motion to dismiss, the defendants raise this failure as relevant to the issue of the ultimate relief that may have been awarded in this case. The plaintiff has recently requested leave to supplement the trial record with the documents numbered P–1 through P–4 which accompany the January 3, 1980 motion. Receiving no objection from the defendant and perceiving no prejudice that could be caused, the documents are allowed to be filed into the record.

**4.** The ordinance describes the B–1 zone as follows:

> B–1 Districts: Transition Business Districts. These districts are composed of land and structures occupied by or suitable for such uses as offices, studios, and public parking lots. Although usually located between residential areas and business areas, these districts are in some instances freestanding in residential areas or they may include hospital or college groups and related uses. The district regulations are designed to protect, and encourage the transitional character of the district by limiting the permitted uses to those of a semi-commercial nature and to protect the abutting and surrounding residential areas by requiring certain minimum yard and area standards to be met, standards that are comparable to those called for in the residence districts.

One of the permitted uses in the B–1 districts is a "clinic, Dental or Medical". Section I of the Ordinance contains the following definition:

> CLINIC, DENTAL OR MEDICAL. A building in which one or more physicians, dentists, and allied professional assistants are engaged in carrying on their profession; the clinic may include a dental or medical laboratory *but it shall not include inpatient care or operating rooms for major surgery.* (Emphasis added.)

**5.** The evidence does not establish when the plaintiff first became aware of the possibility of a problem with the City's zoning ordinance. When asked by the defendant's attorney why the clinic waited so long to apply for a certificate of occupancy, Ms. Oakes, Vice President of M. M. & R., answered that various delays in equipping the building caused the September application after the March purchase.

Since the basis for the denial of the certificate of occupancy was not contained in the four corners of the zoning ordinance, but was an interpretation added by the zoning administrator, this court will assume the plaintiff was in good faith when it located in a B–1 zone. Likewise, plaintiff did not prove the bad faith of the defendant in refusing to issue a certificate of occupancy. This matter will be discussed *infra*.

**6.** Section 24–246 entitled "Certificates of Occupancy" provides:

> Except as hereinafter provided, no structure or land shall be used, occupied, or changed in use until a certificate of occupancy shall have been issued therefor by the office of zoning administration, stating that the proposed use of land or the structure and the proposed use thereof is in full compliance with the provisions of this chapter.

application that no major surgery would be performed.

By letter dated September 14, 1979, the zoning administrator,[7] denied the abortion clinic's certificate of occupancy. (See Exhibit P–3 attached to plaintiff's original Complaint.) In her denial, Ms. Hatfield referred to the uses permitted in a B–1 Transitional Business District Zone and concluded that the building was not properly zoned for the proposed use—an abortion clinic. To reach this result, it was necessary for Ms. Hatfield to decide whether abortion was major or minor surgery. Under the aegis of Section 24–319 of the Bossier City Ordinance, Ms. Hatfield referred to state law to resolve the dispute.

La.R.S. 40:1299.35.6 sets out the information which must be disclosed to a woman before an abortion can be performed. This "informed consent" statute defined abortion as major surgery.[8] Since a building located in a B–1 zone could not "include inpatient care or operating rooms for major surgery",[9] Ms. Hatfield concluded that an abortion clinic, which would house a major surgical procedure, could not be located in a B–1 zone. Therefore, she denied plaintiff's certificate of occupancy.[10] It is this interpretation of Ordinance 33 and the concomitant denial of a certificate of occupancy that plaintiffs attack as an unconstitutional infringement upon a woman's right to a first trimester abortion.

Rather than file an appeal to the Board of Zoning Appeals,[11] or chance a possible prosecution,[12] the plaintiff filed this action in federal court seeking injunctive, mone-

7. Section 24–261 establishes the Office of Zoning Administration:

There is hereby established an office of zoning administration, hereinafter called the "office"; there is hereby vested in the office the duties of administering and enforcing this chapter and the power necessary for administration and enforcement. The zoning administrator shall be the officer in charge of the office.

8. La.R.S. 40:1299.35.6(B) requires the attending physician to inform the patient of several facts when performing an abortion. Subsection (5) states that a physician must inform the patient:

That abortion is a major surgical procedure which can result in serious complications, including hemorrhage, perforated uterus, infection, menstrual disturbances, sterility and miscarriages and prematurity in subsequent pregnancies, and that abortion may leave essentially unaffected or may worsen any existing psychological problems she may have, and can result in severe emotional disturbances.

The constitutionality of this statute has been challenged in federal court for the Eastern District of Louisiana. *Margaret S. v. Edwin Edwards*, Civil Action No. 78–2765. A consensual preliminary injunction was entered which enjoined the state from enforcing this statute. The case has gone to trial and is currently under advisement. This injunction has no effect on the present case.

9. Section 1 of Ordinance 33; *see* note 4, *supra*.

10. At this point, it should be noted that this gloss put on the city's zoning ordinance did not differentiate among the three stages of pregnancy outlined by the Supreme Court in *Roe v.*

*Wade.* Consequently, a clinic performing first trimester abortions is prohibited in a B–1 zone as is a clinic performing second or third trimester abortions. In their brief to dismiss this action pursuant to Rule 41(b), Fed.R.Civ.Pro., the defendants highlight the fact that the plaintiff did not specifically limit its application for a certificate of occupancy to an abortion clinic performing exclusively first trimester abortions. This argument is specious. The state statute referred to by the zoning administrator does not differentiate among the three trimesters. The city has taken the position that all abortions are major surgery and stands ready to produce expert witnesses who will so testify. This court concludes that if plaintiff had specifically stated that its facility would perform only first trimester abortions, the certificate of occupancy would still have been denied.

11. Section 24–275 established a board of appeals. Subsequent sections set out the board's operating procedure and Section 24–280 outlines its specific powers. The futility of an appeal was made clear at trial. Ms. Hatfield stated that she had never been reversed by the Board of Zoning Appeals since she took office 22 years ago.

12. Section 24–250 provides, in part:

Any person, firm, or corporation violating any provision of this chapter shall be fined upon conviction ten dollars ($10.00) nor more than fifty dollars ($50.00) or imprisoned for not more than ten (10) days, or both, for each offense; each day that a violation is permitted to exist shall constitute a separate offense.

tary and declaratory relief.[13] By Order dated October 2, 1979, this court ordered that the hearing to consider the propriety of issuing the requested injunction be consolidated with the trial on the merits in accordance with Rule 65(a)(2) of the Federal Rules of Civil Procedure. The trial of this case started at 1:00 O'Clock P.M. on Tuesday, October 23, 1979. At the close of plaintiff's case, defendants moved to dismiss this action pursuant to Rule 41(b) of the Federal Rules of Civil Procedure. The court took defendant's motion, as well as all pretrial motions, under advisement. Before reaching the merits of plaintiff's case, a few preliminary matters must be discussed.

## II.

Five days prior to trial, defendant filed several motions to dismiss. In its post-trial brief, the plaintiff acquiesced in the defendant's motion to dismiss the City Council as a defendant in this lawsuit. Finding defendant's additional motions to be without merit, they are DENIED.[14]

## A.

■■■ Defendant argues that this court lacks jurisdiction over the subject matter of this action because plaintiff has failed to exhaust its state administrative and judicial remedies. However, the Supreme Court has held that a plaintiff need not exhaust his state administrative remedies in order to file a Section 1983 lawsuit seeking vindication of his constitutional rights. *Steffel v. Thompson*, 415 U.S. 452, 94 S.Ct. 1209, 39 L.Ed.2d 505 (1974); *Houghton v. Shafer*, 392 U.S. 639, 88 S.Ct. 2119, 20 L.Ed.2d 1319 (1968); *Damico v. California*, 389 U.S. 416, 88 S.Ct. 526, 19 L.Ed.2d 647 (1967); *McNeese v. Board of Education*, 373 U.S. 668, 83 S.Ct. 1433, 10 L.Ed.2d 622 (1962); *Monroe v. Pape*, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961). Further, it is the estab-

lished law in this circuit that a plaintiff seeking to protect his constitutional rights cannot be precluded from federal court because of failure to exhaust either his state judicial or administrative remedies. *Wells Fargo Armored Service v. Georgia Public Service Commission*, 547 F.2d 938, 939 n. 1 (5th Cir. 1977); *Hobbs v. Thompson*, 448 F.2d 456 (5th Cir. 1971); *Moreno v. Henckel*, 431 F.2d 1299 (5th Cir. 1970).

As early as 1926, the Supreme Court held that a plaintiff attacking the constitutionality of a municipality's land-use ordinance need not exhaust the appeals process set up in the city's zoning code. *Village of Euclid v. Ambler Realty Company*, 272 U.S. 365, 386, 47 S.Ct. 114, 71 L.Ed. 303 (1926). More recently, the Supreme Court's plurality opinion in *Moore v. The City of East Cleveland, Ohio*, 431 U.S. 494, 97 S.Ct. 1932, 52 L.Ed.2d 531 (1977), dismissed with a footnote the Chief Justice's contention that a plaintiff must first comply with the administrative remedies provided by the City before pressing her constitutional objections to the city's zoning ordinance in federal court. 431 U.S. at 498 n. 5, 97 S.Ct. 1932. Accordingly, this court concludes that plaintiff's failure to exhaust the administrative remedies provided by Bossier City's zoning code does not effect the jurisdiction of this court. The suit is ripe for adjudication and defendant's motion to dismiss for lack of jurisdiction over the subject matter is DENIED.

## B.

■■■ The defendant also argues that the principles announced in *Younger v. Harris*, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971) preclude this court from granting plaintiff injunctive or declaratory relief. However, *Younger* held that the principles of comity and federalism counsel against federal intervention in on-going state pro-

---

**13.** Plaintiff named the following defendants: City of Bossier City; Harvey DeLaune, city attorney; Mamie Hatfield, zoning administrator of Bossier City; and Employers Insurance of Wausau, Inc., the City's insurer. The original Complaint named the City Council of Bossi-

er City as a party defendant. Plaintiffs have agreed to a dismissal of the City Council.

**14.** Defendants' motion to dismiss City Attorney Harvey DeLaune, pursuant to *Imbler v. Pachtman*, 424 U.S. 409, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976) is mooted by this opinion.

ceedings. This rationale is triggered only when there is a pending state proceeding. *Steffel v. Thompson,* 415 U.S. 452, 94 S.Ct. 1209, 39 L.Ed.2d 505 (1974). Although there is the possibility of criminal prosecution under Section 24–250 of the Bossier City Ordinance, there is no existing or even threatened criminal prosecution and the principles announced in *Younger v. Harris* do not apply. *See also Doran v. Salem Inn,* 422 U.S. 922, 95 S.Ct. 2561, 45 L.Ed.2d 648 (1975).

 The defendant also makes a vague argument that the judge-made doctrine of abstention should prevent this court from adjudicating this case.[15] The simple answer is that this case does not contain a controlling issue of state law. Rather, the substantial constitutional right of a female to terminate her pregnancy has been tangentially affected by the application of a municipal zoning ordinance. Abstention has no place in this civil rights suit. *Moreno v. Henckel, supra.* Accordingly, the defendant's request that this court abstain from adjudicating the constitutionality of the municipal zoning ordinance, as applied, is DENIED.

### C.

 Finally, the defendants argue that La.Code Civ.Pro. art. 1880 requires the state to be present in this action.[16] Article 1880 requires service upon the state attorney general in a suit seeking a declaratory judg-

ment effecting the constitutionality of a state statute. However, this suit deals with the constitutionality of a municipal ordinance as applied. The constitutionality *vel non* of a state statute is an issue that will not be reached in this lawsuit. Consequently, defendant's argument that the state must be joined as an indispensible party to this action is meritless. *Cross v. Waguespack,* 308 So.2d 321 (La.App. 4th Cir. 1975); *Butler v. Flint-Goodridge Hospital of Dillard University,* 347 So.2d 1308 (La.App. 4th Cir. 1977).

### III.

At an in-chambers conference held immediately before the trial of this matter, the court was confronted with a motion requesting time in which to file a petition of intervention. The motion was filed by the Shreveport-Bossier Right to Life Association, a nonprofit Louisiana corporation. In the motion, movants claimed "an interest relating to the property which is the subject of this action and is so situated that the disposition of this action may as a practical matter impair its ability to protect that interest." The motion requested 30 days in which to file a formal petition of intervention. Citing the fact that the order setting this trial was issued on October 2, 1979, and questioning the standing[17] of the intervenors, this court denied the intervention.

 Whether intervention is sought permissibly or as of right, Rule 24 of the

---

**15.** The doctrine of abstention was fashioned in *Railroad Commission v. Pullman Company,* 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941) and *Thompson v. Magnolia Petroleum Co.,* 309 U.S. 478, 60 S.Ct. 628, 84 L.Ed. 876 (1940). The doctrine allows a federal court to abstain from deciding a case involving controlling questions of state law which should be decided by the state courts. "Where strands of local law are woven into the case that is before the federal court, we have directed a District Court to refrain temporarily from exercising its jurisdiction until a suit can be brought in the state court." *McNeese v. Board of Education,* 373 U.S. 668, 83 S.Ct. 1433, 10 L.Ed.2d 622 (1963).

**16.** La.Code Civ.Pro. art. 1880 provides:
When *declaratory relief* is sought, all persons shall be made parties who have or claim

any interest which would be affected by the declaration, and no declaration shall prejudice the rights of persons not parties to the proceeding. In a proceeding which involves the validity of a municipal ordinance or franchise, such municipality shall be made a party, and shall be entitled to be heard. If the statute, ordinance, or franchise is alleged to be unconstitutional, the attorney general of the state shall also be served with a copy of the proceeding and be entitled to be heard. (Emphasis added.)

**17.** *Compare Warth v. Seldin,* 422 U.S. 490, 514, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975) *with Planned Parenthood of Minnesota, Inc. v. Citizens for Community Action,* 558 F.2d 861, 869 (8th Cir. 1977).

Federal Rules of Civil Procedure requires that the application to intervene be timely. *Henry v. First National Bank of Clarksdale*, 595 F.2d 291 (5th Cir. 1979); *United States v. Marion County School District*, 590 F.2d 146 (5th Cir. 1979). *See generally*, Wright & Miller, *Federal Practice and Procedure: Civil* § 1916 (1972). To determine the timeliness of a motion, the court must weigh the prejudice to the existing parties and the harm which may occur to the intervenor if an intervention is denied. In the present case, the plaintiff strenuously argued that it would incur substantial prejudice if the trial was delayed. Counsel for the intervenors could offer no suitable explanation for his clients' delay in seeking to intervene, nor could he crystalize any actual harm that may occur to the intervenors if their intervention was denied. Considering these factors, the court denied the motion.

### IV.

One day prior to the trial date, this court received a motion from plaintiff to add Louise Doe as a party plaintiff and to certify her as a class representative of all women "who are or will become pregnant and would prefer to obtain an abortion in this community, rather than to travel to Dallas or to some other distant city." Attached to the motion was the affidavit of Louise Doe. Any information concerning the identity of the affiant had been deleted from this affidavit.

The affiant stated that she was a pregnant female residing in the Shreveport area. She had considered the alternatives and had decided to obtain an abortion. She would prefer to have the pregnancy terminated in the Shreveport-Bossier City area rather than make a long trip to Dallas, Texas. At trial, Ms. Barbara Oakes, an employee of the plaintiff, testified that Louise Doe did exist and that the statements in the affidavit were correct. On the basis of these facts, and perceiving no necessity for a hearing,[18] this court allowed Louise Doe to be added as a party plaintiff.[19] This court certified the following class: all women in the Shreveport-Bossier City area who are or will become pregnant and would prefer to obtain an abortion in this community.

Clearly, all prerequisites set out in Rule 23(a) of the Federal Rules of Civil Procedure have been met.[20] Plaintiff's right to represent herself and all those similarly situated in this 23(b)(2) class action[21] is clearly established in this circuit. *Armour v. City of Anniston*, 597 F.2d 46 (5th Cir. 1979); *Payne v. Travenol Laboratories, Inc.*, 565 F.2d 895 (5th Cir.), *cert. denied*, 439 U.S. 835, 99 S.Ct. 118, 58 L.Ed.2d 131 (1978); *Johnson v. Georgia Highway Express, Inc.*, 417 F.2d 1122 (5th Cir. 1969). Further, in cases like the present which involve sensitive and highly personal mat-

---

**18.** Ordinarily, the district court should hold an evidentiary hearing before certifying a class. However, given the nature of this action and the time limits involved, this court concluded that the class allegations could be decided on the basis of the motion and accompanying affidavit. *Cf. Satterwhite v. City of Greenville*, 578 F.2d 987 (5th Cir. 1978); and *King v. Gulf Oil Co.*, 581 F.2d 1184 (5th Cir. 1978).

**19.** The intensely personal nature of pregnancy highlights the wisdom of allowing plaintiff to use a fictitious name. *S. M. U. Association of Women Law Students v. Wynne and Jaffe*, 599 F.2d 707 (5th Cir. 1979); *Doe v. Deschamps*, 64 F.R.D. 652 (D.Mont.1974).

**20.** Rule 23(a), Fed.R.Civ.Pro. sets out the prerequisite to a class action:

One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

**21.** Rule 23(b)(2), Fed.R.Civ.Pro. provides:

An action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied, and in addition:

(2) the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole.

ters, the reasons for certifying a class become more cogent.

Anonymity can be guaranteed in a class action. The chilling effect of publicly airing so private a matter as the decision to terminate a pregnancy may well preclude a woman from seeking vindication of her constitutional rights in a federal court. *Singleton v. Wulff*, 428 U.S. 106, 96 S.Ct. 2868, 49 L.Ed.2d 826 (1976); *Carey v. Population Services International*, 431 U.S. 678, 97 S.Ct. 2010, 52 L.Ed.2d 675 (1977). Further, it may be that a class could be assembled whose fluid membership could always include some women with viable claims. In this manner, the court is guaranteed that a case or controversy remains for adjudication. A claim of mootness is pretermitted. *Singleton v. Wulff, supra*, 428 U.S. at 117, 96 S.Ct. 2868. *See also Bellotti v. Baird*, 443 U.S. 622, 626, 99 S.Ct. 3035, 3039, 61 L.Ed.2d 797 (1979), and *Roe v. Wade, supra*. Accordingly, it was ordered that this case proceed as a class action and that the plaintiff, Louise Doe, be allowed to represent the claims of the class. As defendants conceded at the in-chambers pretrial conference, this holding eliminates many of the problems raised by the final preliminary issue that this court will consider—standing.[22]

### V.

■ To have the requisite standing[23] to maintain an action, a party seeking relief must allege "such a personal stake in the

outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult constitutional questions." *Flast v. Cohen*, 392 U.S. 83, 99, 88 S.Ct. 1942, 1952, 20 L.Ed.2d 947 (1968), *quoting Baker v. Carr*, 369 U.S. 186, 204, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962). *See also* Brilmayer, *The Jurisprudence of Article III: Perspectives on the "Case or Controversy" Requirement*, 93 Harv.L.Rev. 297, 298 (1979). The touchstone for standing has become "injury in fact"—whether the plaintiff has shown an injury to himself that is likely to be redressed by a favorable decision. *Simon v. Eastern Kentucky Welfare Rights Organization*, 426 U.S. 26, 38, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976). *Accord, Sierra Club v. Morton*, 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972); and *Data Processing Service v. Camp*, 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970).[24]

### A.

■ B. C. M. S. suffers a palpable economic injury by the city's refusal to issue a certificate of occupancy. The ordinance, as applied, prevents the corporation from opening for business. In a determination of standing, the amount of revenue loss is not important. *See United States v. Students Challenging Regulatory Agency Procedures (SCRAP)*, 422 U.S. 289, 95 S.Ct. 2336, 45 L.Ed.2d 191 (1973). The ordinance,

---

**22.** The standing of Louise Doe, as a pregnant female seeking an abortion, has a logical nexus to the claim sought to be adjudicated. Her position also possesses the necessary degree of contentiousness. Her standing cannot be questioned. *Roe v. Wade*, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973); *Flast v. Cohen*, 392 U.S. 83, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968); and *Golden v. Zwickler*, 394 U.S. 103, 89 S.Ct. 956, 22 L.Ed.2d 113 (1969).

**23.** In its constitutional dimension, standing imports justiciability: whether the plaintiff has made out a "case or controversy" between himself and the defendant within the meaning of Article III. This is the threshold question in every federal case, determining the power of the court to entertain the suit. . . . A federal court's jurisdiction therefore can be invoked only when the plaintiff himself has suf-

fered "some threatened or actual injury resulting from the putatively illegal action" . . . . .

*Warth v. Seldin*, 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975), *quoting from Linda R. S. v. Richard D.*, 410 U.S. 614, 617, 93 S.Ct. 1146, 35 L.Ed.2d 536 (1973).

**24.** In addition to a cognizable "injury in fact", *Data Processing* established a second, nonconstitutional standing requirement that the interest of the plaintiff be "arguably within the zone of interests to be protected or regulated" by the statutory framework within which his claim arises. 397 U.S. at 153, 90 S.Ct. at 830. However, this grafted requirement has received paltry attention. *See* Currie, *Federal Courts*, 57 (1975). Regardless, B. C. M. S.'s interest is a regulated conduct within the ambit of the city's zoning ordinance.

as applied, is aimed directly at B. S. M. C. and affects a definite economic interest. Therefore, the relationship between the parties is classically adverse and a case or controversy in the constitutional sense is present. *Warth v. Seldin*, 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975); *Abbott Laboratories v. Gardner*, 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967); *Planned Parenthood of Minnesota, Inc. v. Citizens for Community Action*, 558 F.2d 861, 865 n. 3 (8th Cir. 1977); and *Friendship Medical Center, Ltd. v. Chicago Board of Health*, 505 F.2d 1141 (7th Cir. 1974), *cert. denied*, 420 U.S. 997, 95 S.Ct. 1438, 43 L.Ed.2d 680 (1975).

Further, if the plaintiff corporation ignores the ordinance, it is exposed to the criminal sanctions provided in Section 24–250 of the Ordinances. Even if the plaintiff has not been threatened with prosecution, its imminent possibility is sufficient to grant standing to challenge the ordinance. *See Doe v. Bolton*, 410 U.S. 179, 93 S.Ct. 739, 35 L.Ed.2d 201 (1973); *N. A. A. C. P. v. Button*, 371 U.S. 415, 83 S.Ct. 328, 9 L.Ed.2d 405 (1962); *Arnold v. Sendak*, 416 F.Supp. 22 (S.D.Ind.) (three-judge court), *affirmed* 429 U.S. 968, 97 S.Ct. 476, 50 L.Ed.2d 579 (1976). *Accord Craig v. Boren*, 429 U.S. 190, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976); *Abbott Laboratories v. Gardner, supra* and *Friendship Medical Center Ltd. v. Chicago Board of Health, supra*. To force a plaintiff to suffer a criminal conviction before granting him the requisite standing would "place the hapless plaintiff between the Scylla of intentionally flouting state law and the Charybdis of forgoing what he believes to be constitutionally protected activity in order to avoid becoming enmeshed in criminal proceedings." *Steffel v. Thompson*, 415 U.S. 452, 462, 94 S.Ct. 1209, 1217, 39 L.Ed.2d 505 (1974).

## B.

The right of B. C. M. S. to assert the constitutional claims of its prospective patients who are denied the use of the abortion clinic is a more troublesome question.[25] Standing to litigate the constitutional rights of third parties[26] is generally denied. *Tileston v. Ullman*, 318 U.S. 44, 63 S.Ct. 493, 87 L.Ed. 603 (1943). However, in certain contexts it has been permitted. *See, e. g., Doe v. Bolton*, 410 U.S. 179, 93 S.Ct. 739, 35 L.Ed.2d 201 (1973) and *Griswold v. Connecticut*, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965) (privacy); and *Sullivan v. Little Hunting Park*, 396 U.S. 229, 90 S.Ct. 400, 24 L.Ed.2d 386 (1969) and *Barrows v. Jackson*, 346 U.S. 249, 73 S.Ct. 1031, 97 L.Ed. 1586 (1953) (impossibility of aggrieved party to bring suit); *N. A. A. C. P. v. Alabama*, 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958) (the act of filing suit itself would violate the right sought to be adjudicated).

*Singleton v. Wulff*, 428 U.S. 106, 96 S.Ct. 2868, 49 L.Ed.2d 826 (1976) (plurality opinion) involved a claim that the state of Missouri was unconstitutionally interfering with a woman's decision to terminate her pregnancy by not allowing fees for an abortion to be included in Medicaid benefits. The Supreme Court ruled that physicians who would perform the abortions have standing to challenge the statute because of their own concrete involvement. Whether the physicians could also seek relief on behalf of their patients required more discussion.

The Court finally concluded that the relationship between the physician and his patient, the effectiveness of the doctors' representation, and the inability of the third party to assert her own rights, weighed in favor of allowing the physicians to litigate the constitutional claims of their prospective patients. *Singleton* would be controlling in the present case but for the absence

---

**25.** The resolution of this question was facilitated, perhaps mooted by adding Louise Doe as a party plaintiff. Her claims and the claims of the class she represented are properly before this court. However, the plaintiff corporation is the functional representative asserting these claims, and its standing to do so should be examined.

**26.** This principle of constitutional law is referred to as *jus tertii*.

of a physician-patient relationship. In the instant litigation, a commercial enterprise is seeking to assert the rights of its prospective female customers. Guidance can be found in the recent Supreme Court decision of *Carey v. Population Services International*, 431 U.S. 678, 97 S.Ct. 2010, 52 L.Ed.2d 675 (1977).

In *Carey*, defendant Population Planning Association ("PPA") was a corporation engaged in the mail order sale of contraceptives. New York had a statute prohibiting the sale of contraceptives to minors, forbidding the advertising of contraceptive devices, and restricting the sale of contraceptives to licensed pharmacists. Citing *Craig v. Boren*, 429 U.S. 190, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976), the court held that PPA had standing to challenge the statute in its own right and also on behalf of its potential customers.[27]

■ *Carey* allows a commercial operation to challenge the constitutionality of a state regulatory statute on behalf of its prospective customers when that statute infringes on the rights of privacy guaranteed by *Griswold v. Connecticut*, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965), *Roe v. Wade, supra*, and their progeny. *Carey* controls the instant case and this court holds that B. C. M. S. has standing, on its own behalf and on behalf of its prospective customers, to challenge the constitutionality of the Bossier zoning ordinance. *See also Wynn v. Scott*, 449 F.Supp. 1302 (N.D.Ill. 1978), *affirmed*, 599 F.2d 193 (7th Cir.), *appeal dismissed*, 439 U.S. 8, 99 S.Ct. 49, 58 L.Ed.2d 7 (1979); *Mahoning Women's Cen-*

ter v. Hunter, 444 F.Supp. 12 (W.D.Ohio 1977), *affirmed*, 610 F.2d 456 (6th Cir., 1979); *Planned Parenthood of Minnesota, Inc. v. Citizens for Community Action*, 558 F.2d 861 (8th Cir. 1977); *Mobile Women's Medical Clinic v. Board of Commissioners*, 426 F.Supp. 331 (S.D.Ala.1977); and *Friendship Medical Center Ltd. v. Chicago Board of Health, supra*.

## VI.

■ Zoning is a non-particularized legislative process in which rules are promulgated and land areas designated on a general, prospective basis. *Bayou Landing, Ltd. v. Watts*, 563 F.2d 1172 (5th Cir. 1977), *cert. denied*, 439 U.S. 818, 99 S.Ct. 79, 58 L.Ed.2d 109 (1978). Comprehensive zoning schemes set up by city ordinance have been held to be a proper exercise of the state's police power.[28] The legislature has the power to look after the health, safety, morals and general welfare of the public. Zoning ordinances have been held to be a constitutional exercise of this power. *Village of Euclid v. Ambler Realty Company*, 272 U.S. 365, 47 S.Ct. 114, 71 L.Ed. 303 (1926); *Zahn v. Board of Public Works*, 274 U.S. 325, 47 S.Ct. 594, 71 L.Ed. 1074 (1927); *Berman v. Parker*, 348 U.S. 26, 75 S.Ct. 98, 99 L.Ed. 27 (1954); and *Village of Belle Terre v. Boraas*, 416 U.S. 1, 94 S.Ct. 1536, 39 L.Ed.2d 797 (1974).

## A.

■ In Louisiana, R.S. 33:4721, *et seq.*,[29] municipal governing authorities are

27. In *Craig v. Boren*, the court held that a vendor of 3.2% beer had standing to challenge in its own right and as advocate for the rights of third persons, the gender-based discrimination in a state statute that prohibited sale of the beer to men, but not to women, between the ages of 18 and 21.

28. When describing the state's police power, Justice Douglas stated:

We deal . . . with what traditionally has been known as the police power. An attempt to define its reach or trace its, outer limits is fruitless, for each case must turn on its own facts. The definition is essentially the product of legislative determinations addressed to the purposes of government, pur-

poses neither abstractly nor historically capable of complete definition. Subject to specific constitutional limitations, when the legislature has spoken, the public interest has been declared in terms well-nigh conclusive. In such cases the legislature, not the judiciary, is the main guardian of the public needs to be served by social legislation . . . ..
*Berman v. Parker*, 348 U.S. 26, 32, 75 S.Ct. 98, 102, 99 L.Ed. 27 (1954).

29. La.R.S. 33–4721, as amended in 1977, provides:

For the purpose of promoting health, safety, morals, or the general welfare of the community, the governing authority of all munici-

granted the power to regulate land use. This power has its source in the state's police power. *Four-States Realty Co., Inc. v. City of Baton Rouge*, 309 So.2d 659 (La. 1975); *Hardy v. Mayor and Board of Aldermen of City of Eunice*, 348 So.2d 143 (La. App. 3d Cir. 1977), *writ refused*, 350 So.2d 1212. Pursuant to this enabling act, Bossier City enacted its present zoning ordinance which sets up a comprehensive scheme for land use within the city's corporate limits. Such a zoning ordinance is valid unless it exceeds constitutional restrictions.

### B.

In *Nectow v. City of Cambridge*, 277 U.S. 183, 48 S.Ct. 447, 72 L.Ed. 842 (1927), Justice Sutherland stated:

[A] court should not set aside the determination of public officers in such a matter [zoning] unless it is clear that their action 'has no foundation in reason and is a mere arbitrary or irrational exercise of power having no substantial relation to the public health, the public morals, the public safety or the public welfare' . . . .

277 U.S. at 187–188, 48 S.Ct. at 448, *quoting Euclid v. Ambler Realty Company*, 272 U.S. 365, 395, 47 S.Ct. 114, 71 L.Ed. 303 (1926).[30]

Since *Euclid*, courts have traditionally afforded deference to the local zoning ordinances. *See Village of Belle Terre v. Boraas*, 416 U.S. 1, 94 S.Ct. 1536, 39 L.Ed.2d 797 (1974); and *Trustees of Mortgage Trust of America v. Holland*, 554 F.2d 237 (5th Cir. 1977). Early on, the Supreme Court announced "[t]he most that can be said [of this zoning ordinance] is that whether a determination was an unreasonable, arbitrary or unequal exercise of power is fairly debatable. In such circumstances, the settled rule of this court is that it will not substitute its judgment for that of the legislative body charged with the primary duty and responsibility of determining the question." *Zahn v. Board of Public Works*, 274 U.S. 325, 47 S.Ct. 594, 71 L.Ed. 1074 (1927).

B. C. M. S. argues that this traditional judicial deference has no application when the zoning ordinance infringes on the constitutionally protected choice of whether or not to bear a child.[31] The plaintiff corporation further argues that the ordinance cannot stand constitutional scrutiny if supported by a rational basis but must be justified by a 'compelling state interest'. *See Roe v. Wade, supra*, and *Carey v. Population Services International, supra*. The standard of judicial scrutiny to be invoked becomes the linchpin of this decision. The

palities may regulate and restrict the height, number of stories, and size of structures, the percentage of lot that may be occupied, the size of yards, courts, and other open spaces, the density of population, and the location and use of the buildings, structures, and land for trade, industry, residence, or other purposes; provided that zoning ordinances enacted by the governing authority of municipalities or the acts of the zoning commission, board of adjustment as herein provided for, or zoning administrator shall be subject to judicial review on the grounds of abuse of discretion, unreasonable exercise of the police powers, an excessive use of the power herein granted, or the denial of the right of due process, provided, further, that the right of judicial review of a zoning ordinance shall not be limited by the foregoing.

30. Louisiana cases interpreting § 4721 have tracted this language. *See e. g., A. Copeland Enterprises, Inc. v. City of New Orleans*, 372 So.2d 764 (La.App. 4th Cir. 1979); and *Meyers v. City of Baton Rouge*, 185 So.2d 278 (La.App. 1st Cir. 1966).

31. B. C. M. S. is challenging not the underlying ordinance, but its application in this case. *See Yick Wo v. Hopkins*, 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1885). The ordinance did not contain a schedule of what constitutes major and minor surgery. To resolve this lacuna, the ordinance referred to state law for guidance. The zoning administrator found that state law defined abortion as major surgery. Her actions were in conformance with the ordinance. However, for purposes of plaintiff's constitutional challenge, the distinction between an ordinance's constitutional defects "as applied" or "as written" is of no legal consequence to a decision of this case.

Further, since the zoning administrator was carrying out the intent of the ordinance, as manifested by the municipal governing authority, her decision should be afforded the same scrutiny generally given to zoning decisions of the legislative body made pursuant to its police power.

plurality decision of the Supreme Court and its accompanying opinions in *Moore v. City of East Cleveland, Ohio*, 431 U.S. 494, 97 S.Ct. 1932, 52 L.Ed.2d 531 (1977) contain a statement of the issue and its resolution.

## VII.

East Cleveland, like many other cities across the country, had a housing ordinance which limited occupancy of a dwelling unit to members of a single family. However, the ordinance went on to define family in such a way that certain related members were excluded. The ludicrous result was that plaintiff's two grandsons, who were not brothers but first cousins, would place plaintiff in violation of the ordinance if they both lived in her home. The reasons advanced by the city in support of this ordinance formed no arguable basis for such an intrusion into family life.

### A.

Justice Powell, writing for the plurality, stated, "When a city undertakes such intrusive regulation of the family, neither *Belle Terre* nor *Euclid* governs; the usual judicial deference to the legislature is inappropriate." 431 U.S. at 499, 97 S.Ct. at 1935. Resting his decision on substantive due process, Justice Powell went on to add, "[W]hen the government intrudes on choices concerning family living arrangements, this court must examine carefully the importance of the governmental interests advanced and the extent to which they

are served by the challenged regulation." 431 U.S. at 499, 97 S.Ct. at 1936.

■ *Moore* represents a flagrant example of a substantial state intrusion into the home life of the modern family. In addition, the reasons advanced by the city for this invasion were senseless and spurious. In contrast, in the present case, the ordinance itself does not curtail the enjoyment of a fundamental right. The ordinance relates to land use generally, and the question becomes whether its application, which does affect a constitutional right, is reasonable.[32]

A commercial enterprise cannot disregard the land use regulations of a valid zoning ordinance merely because its customers may be exercising a fundamental right. Plaintiffs do not contend that B. C. M. S. is free to locate wherever it may please. Given the facts of this case, it is the opinion of this court that the question becomes whether the interpretation of the Bossier ordinance was reasonable. This conclusion is supported by Justice Stevens' concurrence in *Moore*.[33]

### B.

Justice Stevens found the critical question to be "whether East Cleveland's housing ordinance is a permissible restriction on [the plaintiff's] right to use her own property as she sees fit." 431 U.S. at 513, 97 S.Ct. at 1943. Justice Stevens would apply the standard set forth in the leading land use case of *Euclid v. Ambler Realty Co., supra. Euclid* requires that before a zoning ordi-

---

**32.** Involved in this case is a preexisting zoning ordinance. The validity of this land use scheme is not contested. The definition of abortion as major surgery incorporated from a Louisiana state statute is the defect of which plaintiff complains. There is no direct regulation of a fundamental right. The consequences are tangential. Therefore, this court disagrees with the plaintiff's argument that the Bossier ordinance is abortion-specific.

**33.** By a plurality, the *Moore* court held the East Cleveland ordinance unconstitutional. Three Justices, Brennan, Marshall and Blackmun joined in Powell's plurality opinion. Justice Powell refused to follow the *Euclid-Village of Belle Terre* zoning rationale when a fundamental right was involved. Four justices dissented

and Justice Stevens concurred in the result and filed a separate opinion. "When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, 'the holding of the Court may be viewed as that position taken by those Members who concurred in the judgment on the narrowest grounds . . . .'" *Marks v. United States*, 430 U.S. 188, 193, 97 S.Ct. 990, 993, 51 L.Ed.2d 260 (1977), *quoting from Gregg v. Georgia*, 428 U.S. 153, 169 n. 15, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976). In *Moore*, the narrowest holding sustaining the Court's judgment would be that of Justice Stevens. Therefore, this court will follow his rationale in zoning cases involving fundamental rights. His was also the deciding vote.

nance can be declared unconstitutional, "[it must be shown to be] 'clearly arbitrary and unreasonable, *having no substantial* relation to the public health, safety, morals, or general welfare.'" 431 U.S. at 514, 97 S.Ct. at 1943, *quoting Euclid* 272 U.S. at 395, 47 S.Ct. 114 (emphasis in original).

By applying this test to the East Cleveland zoning ordinance, Justice Stevens found it unconstitutional as,

> The city has failed totally to explain the need for a rule which would allow a homeowner to have two grandchildren live with her if they are brothers, but not if they are cousins. Since this ordinance has not been shown to have any "substantial relation to the public health, safety, morals, or general welfare" of the city of East Cleveland . . . it must fall under the limited standard of review of zoning decisions which this Court preserved in *Euclid* and *Nectow*.

431 U.S. at 520, 97 S.Ct. at 1946. Applying this rationale to the present case, the court finds the Bossier ordinance, as interpreted by the zoning administrator, to be a reasonable exercise of the city's zoning authority substantially related to its police powers.

### VIII.

The B–1 Transition Business District Zone is designed to serve as a buffer between the heavier commercial areas and the residential zones. According to the testimony of the zoning administrator, such factors as noise, traffic patterns, availability of off-street parking, and other problems which may accompany a particular permitted use, determine how a particular area is zoned. The B–1 zone is also important to keep the complexion of the area conducive to the nearby residential users. The general nature of B–1 uses and the problems triggered by the allowance of an unsuitable use is illustrated by the zoning history of the Bossier City General Hospital.

The 1958 Ordinance originally established hospitals in a B–1 zone. However, because of increased traffic flow, noise level and need for businesses that service a hospital such as a grill and drugstore, it became necessary to change hospitals to a B–3 zone. Consequently, Bossier City General Hospital is a nonconforming use. The zoning administrator testified that a second hospital had inquired about the possibility of locating in Bossier City and was informed it would have to located in a B–3 zone.[34]

The validity of Bossier's comprehensive zoning plan is not contested. It is a valid exercise of the police power. However, the decision of the zoning administrator to classify abortion as major surgery is challenged. The evidence established that the clinic's purpose and planned opening became common knowledge shortly after the clinic located in Bossier City. In conversations with B. C. M. S.'s local attorneys, Ms. Hatfield, the zoning administrator, became aware of the exact nature of the clinic's business. To classify the medical technique involved in a first trimester abortion, the zoning administrator referred to a state statute. This reference was reasonable and indicated by the ordinance.

■ At trial, plaintiffs introduced the testimony of three doctors, all experts in the field of obstetrics and gynecology. Plaintiffs attempted to prove that a first trimester abortion was a minor surgical procedure. However, this information was not presented to the zoning administrator, nor the municipal governing authority. The classification of first trimester abortions as major or minor surgery for zoning purposes is a decision for the legislature, not the courts. Accordingly, the court finds that the questioned application of the Bossier zoning ordinance was reasonable under the circumstances. Consequently, the zoning decision is valid. *Euclid v. Ambler Realty Company, supra; Zahn v. Board of Public Works, supra*; and *Village of Belle Terre v. Boraas, supra. Cf. Moore v. City of East Cleveland, supra* (Stevens, J., concurring).

---

**34.** B. C. M. S. is zoned for B–3 uses. As trial testimony and Exhibit P–7 indicated, B–3 property is available within the city's corporate limits.

## CONCLUSION

Bossier City may not want an abortion clinic in its community,[35] but it has not precluded one. Finding a reasonable exercise of the municipal zoning authority and finding no overt discriminatory action, this court holds that Bossier City can validly regulate the location of an abortion clinic through a legitimate exercise of its land use regulatory power.

This court is aware of its duty to ensure that no state regulation impermissibly infringes on a woman's privacy right to terminate her pregnancy as guaranteed in *Roe v. Wade*. However, not all state regulations that affect first trimester abortions are unconstitutional. *See, e. g., Bellotti v. Baird*, 443 U.S. 622, 99 S.Ct. 3035, 61 L.Ed.2d 797 (1979); *Maher v. Roe*, 432 U.S. 464, 97 S.Ct. 2376, 53 L.Ed.2d 484 (1977); *Connecticut v. Menillo*, 423 U.S. 9, 96 S.Ct. 170, 46 L.Ed.2d 152 (1975); *Baird v. Department of Public Health of Commonwealth of Mass.*, 599 F.2d 1098 (1st Cir. 1979). *Cf. Hodgson v. Lawson*, 542 F.2d 1350 (8th Cir. 1976) and *Women's Medical Center of Providence, Inc. v. Cannon*, 463 F.Supp. 531, 536 n. 8 (D.R.I.1978). As Justice Brennan wrote in his concurrence in *Moore v. City of East Cleveland* :

I do not question that a municipality may constitutionally zone to alleviate noise and traffic congestion and to prevent overcrowded and unsafe living conditions, in short to enact reasonable land-use restrictions in furtherance of the legitimate objectives East Cleveland claims for its ordinance. But the zoning power is not a license for local communities to enact senseless and arbitrary restrictions which cut deeply into private areas of protected family life. . . .

431 U.S. at 506–7, 97 S.Ct. at 1939. The present case is not an arbitrary and senseless bad faith exercise of municipal land use power. If this court had found the representations of the city attorney to be mere subterfuge for what was in reality a discriminatory decision to preclude or infringe upon the constitutionally guaranteed right to a first trimester abortion, the result would be different.[36]

At the close of plaintiff's case, the court took under advisement a motion for involuntary dismissal made pursuant to Rule 41(b) of the Federal Rules of Civil Procedure. In ruling on a 41(b) motion, the court is required to weigh the evidence, resolve any conflicts and find where the preponderance lies without making any special inferences in favor of the plaintiff. *Emerson Electric Co. v. Farmer*, 427 F.2d 1082 (5th Cir. 1970); Wright & Miller, *Federal Practice and Procedure: Civil* § 2371, pp. 224–225 (1971). In this case, the court

---

**35.** In addition to the ill-advised state court suit filed on September 12, 1979, by the city attorney for Bossier City, the City Council, on June 5, 1979, passed a resolution which read, in part:

> WHEREAS, M M & R, Inc., a Texas corporation, has purchased property in Medical Plaza, Bossier City, Louisiana, and announces that they intend on operating an abortion facility on the property;
> WHEREAS, there is no demand or requirement for an abortion facility by the citizens of Bossier City;
> WHEREAS, it is believed by the City Council that an overwhelming majority of residents of Bossier City are opposed to the location of an abortion facility in this City.
> NOW THEREFORE, BE IT RESOLVED that the City Council of the City of Bossier City, Louisiana, opposes the establishment of an abortion facility in Bossier City and asks the M M & R Corporation not to locate such a facility in this City.

However, after hearing the testimony of the city attorney, this court is convinced that the city subsequently made a good faith zoning decision and if the clinic had located in the proper zone, a certificate of occupancy would have been issued.

**36.** In *Church of God of Louisiana, Inc. v. Monroe-Ouachita Regional Planning Commission*, 404 F.Supp. 175 (W.D.La.1975), this court did not hesitate to overturn a municipal zoning decision after finding that it was prompted by racial discrimination. However, the evidence in this case does not support a finding of discrimination or arbitrary and capricious action. The court accepts as true the following statement in the defendants' brief accompanying their Rule 41(b) motion:

> Bossier City's zoning ordinance would not entirely prohibit abortions within the city's corporate limits. Such procedures would be permissible in areas zoned B–3. Such areas have been and are available to plaintiff.

has concluded that the plaintiffs have not carried their burden of persuasion in proving that the defendants acted arbitrarily, capriciously and with a discriminatory animus when plaintiff was denied a certificate of occupancy. Defendants' motion to dismiss pursuant to Rule 41(b) is GRANTED and plaintiffs' request for monetary declaratory and injunctive relief is DENIED and this action is DISMISSED.